873 F.2d 474
 13 Fed.R.Serv.3d 984
 FEDERAL DEPOSIT INSURANCE CORPORATION, etc., Plaintiff, Appellee,
v.
FRANCISCO INVESTMENT CORPORATION, et al., Defendants, Appellees.
Appeal of Frederick J. GONZALEZ, et al., Defendants.
FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff, Appellee,
v.
FRANCISCO INVESTMENT CORPORATION, et al., Defendants, Appellants.
 Nos. 86-1717, 87-1029.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 9, 1988.
Decided May 1, 1989.
 
 Fernando Gallardo, San Juan, P.R., for defendants, appellants Francisco Inv. Corp., et al.
 Gabriel I. Penagaricano, San Juan, P.R., for defendants, appellants Frederick J. Gonzalez and Gloria Gonzalez.
 John David Ferrer, Santurce, P.R., with whom Michael B. Burgee, Deputy Gen. Counsel, Washington, D.C., Rae Schupack, Regional Counsel, New York City, Enrique G. Banuchi, Laguna-Niguel, Cal., Gonzalez, Bennazar & Colorado and Jaime Brugueras, Hato Rey, P.R., were on brief, for plaintiff, appellee.
 Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.
 TORRUELLA, Circuit Judge.
 
 
 1
 These cases, related only coincidentally on the facts, come to us on appeal in very different postures. The first case hinges on whether the suit was barred by the applicable statute of limitations and whether the district court was clearly erroneous in determining that the debt had not been paid. The second requires us to determine whether the district court abused its discretion in refusing to set aside a default judgment. We address each case separately.
 
 
 2
 The judgment in the first case is affirmed, because the record, as developed before us, leaves no alternative. Because we find that the district court abused its discretion in not setting aside the default, we reverse the judgment in the second case.
 
 I. The case of Francisco Investment
 
 3
 This appeal follows a one day bench trial, of which we have only a partial transcript. The issues before us are precisely those that required determination below and we have the benefit of a well articulated decision by the court and the documentary evidence presented by both sides. The issues before us are discrete and circumscribed, first, whether the action was barred under the applicable statute of limitations; second, whether the debt evidenced by the promissory note was in fact paid. We find no error in the court's determination and affirm the judgment against appellant.
 
 Background
 
 4
 Francisco Investment Corp. ("Francisco") entered into a series of transactions with Banco de Economias y Prestamos ("the Bank") for the purpose of acquiring a nursing home from Plan Permanente de Servicios Medicos Completos de Puerto Rico, Inc. ("Plan Permanente"). The Bank lent Francisco $200,000 in order for the latter to purchase the stock outstanding of the nursing home. A second transaction, the one that concerns us now, began as an assumption of an overdraft of Plan Permanente, for $283,812.21. The bank converted the assumed overdraft into a loan with Francisco as debtor, for the same amount, payable in 30 days, and guaranteed by Francisco Murcia Valcarcel ("Murcia") and Miguel Oppenheimer Ortiz up to the amount of $460,000. Not long thereafter, the bank found itself in serious financial difficulties. The Federal Deposit Insurance Corporation (FDIC), in an attempt to save the bank, acquired the notes in 1977.
 
 
 5
 Murcia, president of Francisco and personal guarantor of the debt, signed an acknowledgment of the debt on September 3, 1982. The acknowledgment was notarized, and states specifically that the loan "is due and payable in the principal amount of $283,718.63[1] plus interest in the amount of $185,787.10." Several weeks thereafter, FDIC filed the instant suit to recover on the $283,812.21 loan.
 
 
 6
 The court found, for reasons we explain below, that the $283,000 loan was civil, not mercantile, and thus that the action by the FDIC, begun in 1982, was brought within the 15-year statute of limitations. The court further found that the debt remained unpaid, and entered judgment accordingly, 638 F.Supp. 1216.
 
 
 7
 Appellants' task before us is almost herculean, having to prevail against the strictures of Federal Rule of Civil Procedure 52(a) which provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."
 
 Discussion
 
 8
 The first issue is whether the suit was brought within the statute of limitations. The district court held that the suit was brought timely within the 15 year period provided for civil debts. Civil Code of Puerto Rico Article 1864, 31 L.P.R.A. Sec. 5294 (1968). Appellant alleges that the debt is mercantile in character and thus a three year limitation applies. Commerce Code Article 946, 10 L.P.R.A. Sec. 1908 (1976). But even if the debt is characterized as mercantile, the action still falls within the three year statute of limitations because the debt was reaffirmed in 1982, only weeks before the complaint was filed. Under the Commerce Code an acknowledgment of a debt begins anew the running of the statute of limitations, even after it expired. Commerce Code Article 941, 10 L.P.R.A. Sec. 1903 (1976); Vazquez v. Freiria, 27 P.R.R. 764 (1919). Appellants explain that the acknowledgment was the result of coercion and misrepresentations on the part of FDIC, which held in its possession assets belonging to Murcia, and which represented to him that the acknowledgment would be only necessary until Murcia presented bank records that would prove that the debt had in fact been paid. The excuses proffered for signing the acknowledgment, as the district court found, simply ring hollow, and we see no basis to overturn the court's findings. The action was therefore timely.
 
 
 9
 The remaining issue, namely, whether the debt was paid, hinged on the credibility of Murcia. FDIC held a note on a debt, on its face still outstanding. Francisco and the individual defendants had the full burden of proving extinction of the debt. 31 L.P.R.A. Sec. 3261 (1968).
 
 
 10
 Murcia presented, besides his own testimony, some of the Bank's records showing that another corporation he controlled, Losan, Inc. ("Losan"), had paid a debt of the same amount as the Francisco debt. Additional circumstantial evidence also succored his version: the Bank commenced an action against Francisco in March 1974; by November 1975 the action was voluntarily dismissed. Also in November 1975, Losan appears to have assumed a debt, for the amount of $283,812.21, payable in a year, with an interest rate of 12%--that is, exactly the terms of the loan to Francisco.
 
 
 11
 As to the crucial aspect of this issue, namely, the link between Losan's transaction and that of Francisco, we are handicapped by the absence of the trial transcript. The trial judge found, however:
 
 
 12
 It is very difficult to imagine that if he indeed paid the loan, through whatever means, he did not keep accurate evidence of payment. The court could have looked at various documents that could evidence payment, to wit: (a) a complete accounting of the corporation's accounts with the Bank (statements of account) as performed by the corporation's accountants; (b) the recognition of the debt and the eventual cancellation in the corporation's financial statements filed, as required by local law, annually at the Department of State and Treasury, and evidence from bank officials who could have shed light on the subject. This was not done. Defendants did not meet their burden.
 
 
 13
 638 F.Supp. at 1219 n. 3 (D.P.R.1986). There was no attempt by Francisco to present further evidence, newly discovered evidence, or to amend the findings under Rules 52, 59 or 60. In the peculiar stance of this case, we are left with no option but to affirm.
 
 II. The case of Dr. Frederick Gonzalez
 Background
 
 14
 The first transaction entered by Francisco for the acquisition of a nursing home from Plan Permanente was effected through a multi-party contract executed on January 10, 1973. As part of this contract, the Bank lent Francisco $200,000 for a limited time period of 45 days. This loan was guaranteed by several individuals, including Dr. Frederick Gonzalez ("Gonzalez"). The guaranty signed by Gonzalez was in the form of a letter of continuing guarantee which secured the $200,000 obligation and any debt that "at the present or in the future is owed" by Francisco to the Bank. However, the total exposure of Gonzalez was limited to the principal amount of $200,000, interest, costs and attorney's fees. The original contract also provided that upon maturity (45 days), or earlier, the loan "shall become individual loans of the [guarantors], as long as they offer real estate property as collateral that may be acceptable to the Bank." App. 85.
 
 
 15
 As mentioned earlier, FDIC filed a complaint in federal court to recover on a subsequent $283,812.21 loan. Included as a defendant on the amended complaint was Gonzalez and his wife (who, although not a co-signer, was potentially liable under Puerto Rico law). They were served with the complaint on June 7, 1983 but did not answer or otherwise appear in court.
 
 
 16
 By affidavit, Gonzalez averred that, upon being summoned, he immediately contacted Murcia. Murcia told Gonzalez that the latter's inclusion in the complaint was a mistake, since he knew that the loan under which he was being sued had been fully paid several years earlier. Murcia further stated that his lawyer would clear up the situation and see to it that Gonzalez and his wife were discharged. Murcia reiterated these assurances on subsequent occasions.
 
 
 17
 On June 28, 1983, FDIC moved for entry of default, which motion was granted on August 24, 1983 by the clerk of the court.
 
 
 18
 The next communication Gonzalez had regarding the lawsuit occurred in October 1983, when he was noticed to appear for a deposition in the case still pending against the other defendants. The following exchange took place between FDIC's counsel and Gonzalez:
 
 
 19
 Mr. Gonzalez, I hereby apprise you of the right you have to have counsel here today to aid you in the answering of any questions that might be posed to you by any of the attorneys here which have been presented for the record and I would like you to, for the record, state your position as to the non-appearance of your counsel, if any.
 
 
 20
 THE DEPONENT: Yes. For the record, approximately six weeks or two months ago I was called to the FDIC and I did bring a lawyer by the name of Jose Tous.[2] I didn't think it was necessary for him to come here today in view of the fact that this subpoena was given to me just a few days ago, in fact the last subpoena was given to me yesterday, in which they said it was part of the routine and he is busy with another case and I said to him I didn't think it was necessary, so I waive the presence of my lawyer here at this moment and when it is necessary he will come into the case if it is necessary.
 
 
 21
 On June 1, 1984, FDIC requested an amended judgment against Gonzalez and his wife, to include the exact amounts due. The amended judgment was entered on June 11, 1984.
 
 
 22
 On March 8, 1985, FDIC requested execution of the judgment and attachment against Gonzalez and his wife. In October 1985, Gonzalez learned that a default judgment had been entered against him, and that FDIC had voluntarily dismissed the complaint as to the other guarantors. The claims as to the remaining defendants resulted in the bench trial that occupied us in the first part of this opinion. In January 1986, Gonzalez was told--in a newly scheduled deposition--that the complaint had not been dismissed as to him, and that execution of the default judgment was likely.
 
 
 23
 Gonzalez then obtained counsel and moved on February 28, 1986 for relief from default. This motion was denied by a court order dated April 3, 1986 and filed April 4, which counsel for Gonzalez alleges he never received.[3] It is from this order that Gonzalez and his wife appeal.
 
 Discussion
 
 24
 First we should determine the standard applicable when ruling on a motion to set aside a non-final default judgment. Federal Rule of Civil Procedure 55(c) provides that the Court may set aside an entry of default for "good cause" and that a judgment by default may be set aside using the more restrictive provisions of Rule 60(b) for final judgments. A cursory reading of the rule seems to mandate the application of the stricter standards of Rule 60(b) to all requests to set aside default judgments. However, the Rule 60(b) standards were tailored for setting aside final judgments. In the case at bar, when the court denied defendants' motion to set aside default judgment, it had not become final. Fed.R.Civ.P. 54(b).
 
 
 25
 Thus, the more liberal "good cause" standard should be applied. See 7 J. Moore & J. Lucas, Moore's Federal Practice, p 60.20 (1987). Generally, non-final judgments can be set aside or otherwise changed by the district court at any time before they become final. Fed.R.Civ.P. 54(b). If we were to apply the 60(b) standard to non-final default judgments we would have the anomaly of using the strict standard envisioned for final judgments to non-final default judgments and the more liberal standard of Rule 54(b) to other non-final judgments. This result would be inconsistent with the purposes underlying the Federal Rules of Civil Procedure, especially considering that when deciding whether to set aside entries of default and default judgments courts favor allowing trial on the merits. Rios Bridoux v. Eastern Air Lines, Inc., 214 F.2d 207 (D.C.Cir), cert. denied, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954).
 
 
 26
 Because of the diverse considerations involved, the determination of whether to set aside an entry of default is left to the sound discretion of district judges--a discretion we can overrule only when it is abused. See Taylor v. Boston and Taunton Transp. Co., 720 F.2d 731, 732-33 (1st Cir.1983). Unfortunately, in this case we lack insight into the district court's weighing of the equities because the court granted and denied succeeding motions by the use of cryptic "margin orders" which failed to explain the factors considered.
 
 
 27
 Both sides agree that "good cause" depends on why the defaulting party failed to appear, whether the party has a meritorious defense, and whether setting aside the default will prejudice the party who secured the default. See 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice, p 55.10 (1988); see also Bond Leather Co., Inc. v. G.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 938-39 (1st Cir.1985).
 
 
 28
 We will discuss the factors in that order. First, as to why the defaulting party failed to appear, we note that Gonzalez relied on the statement of Murcia to the effect that (1) the debt had been paid, and (2) that Murcia's lawyer would clarify the situation before the court. Common sense confirms the accuracy of this version, for Gonzalez had much to lose and nothing to gain from a willful default.
 
 
 29
 FDIC would have us find that Gonzalez was aware of the status of the case from the exchange that occurred in the October 1983 deposition. The most we can distill from that exchange is that Gonzalez understood that he did not need to have counsel present at the deposition.
 
 
 30
 This first part of the test, however, favors the government. Upon proper notification of pending action parties must respond diligently, or face the concededly harsh consequences of a judgment resulting not from consideration of the merits, but from the parties' own inaction. This determination would normally suffice to decide the case. See Shepard Claims Service v. William Darrah & Associates, 796 F.2d 190, 193 (6th Cir.1986). However, the equities of this case, involving a governmental agency, force us to examine very closely the other two aspects of the test.
 
 
 31
 The second part of the test is whether appellant has a potentially meritorious defense. Since the letter of guarantee has an aggregate ceiling amount, a meritorious defense by Gonzalez would be that he paid the $200,000 necessary under the guarantee. There are several indications on the record that in fact Gonzalez had made at least some payments under the letter. First, the January 10, 1973 contract specifically contemplated that the $200,000 loan would, before the expiration of 45 days, be converted into individual loans of the guarantors. This conversion, of course, would release Gonzalez from the letter of guarantee up to the amount of his individual loan. Second, an internal Bank memorandum dated August 29, 1973 mentions the agreement to convert the $200,000 into individual loans of the guarantors and states only that Dr. Luis Ramos "did not comply with his commitment." This may indicate that the other guarantors, including Gonzalez, did pay at least part of the $200,000 loan with the proceeds of individual loans. Third, another internal memorandum, this one dated December 30, 1982, states that all the guarantors except Dr. Ramos had in fact taken out individual loans in lieu of the original loan as per the original contract. Fourth, before the FDIC dismissed the suit against the other guarantors, they specifically alleged that Gonzalez had paid $100,000 of the original debt. For the purpose of removing a default and going to trial this is a sufficient showing of a potential, at least partial, defense.
 
 
 32
 The third part of the test is whether FDIC was prejudiced by the default. The issue is not mere delay, but rather its accompanying dangers: loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion. See 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2699 (2d ed. 1983). In this case, since it is mainly based on documentary evidence in FDIC's control, FDIC will not be prejudiced from the delay caused by the default.
 
 
 33
 Considering the fact that there exists a potentially meritorious defense, i.e., payment of the debt, and that no prejudice will flow to FDIC, we hold that the district court abused its discretion in denying the motion to set aside the default, and therefore reverse.
 
 
 
 [1]
 The difference in the amount reflected in the acknowledgment, $283,718.63 instead of $283,812.21, was the result of a clerical error
 
 
 [2]
 The nature of this communication between FDIC and Dr. Gonzalez, which must have occurred after the entry of default, was never explained
 
 
 [3]
 The Notice of Appearance by appellants' counsel, filed on February 18, 1986, was also noted on April 4, 1986